### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

    *Plaintiff,*

vs.

    Case No. 15-10093-EFM

CHRISTOPHER A. REYNOLDS,

    *Defendant.*

### MEMORANDUM AND ORDER

On November 20, 2010, Defendant Christopher Reynolds was driving his roommate's vehicle with two additional passengers. After Wichita Police Department ("WPD") officers began following the vehicle, Reynolds pulled into a private drive and moved to the back passenger seat, allowing one of the vehicle's other passengers to take the wheel. WPD officers subsequently stopped the vehicle, removed Reynolds from it, and searched it. Reynolds was arrested based on the items located in the vehicle.

Reynolds now claims that the officers' initial stop, his detention, and the search of the vehicle are unconstitutional. He seeks to suppress both the statements he made while detained in the patrol car and the evidence obtained from the search of the car. Because the Court finds that the officers made a lawful traffic stop and had probable cause to search the vehicle, the Court denies Reynolds' Motions to Suppress (Docs. 26 and 27).

## I.     Factual and Procedural Background

On the night of November 10, 2010, WPD Officers Kevin Dykstra and Matthew Balthazor were patrolling together as a two-person Special Community Action Team. Around midnight, they stopped at a convenience store located in west Wichita. Officer Dykstra saw a dark gray Nissan Altima pull into the convenience store parking lot. He recognized the vehicle, as it was frequently driven by James Wheeler, a suspect in a narcotics investigation. As the car passed Officer Dykstra, he saw a man, Defendant Reynolds, driving it wearing a heavy blue coat and a baseball cap. Also present in the car were two female passengers. According to the officers, Reynolds appeared to be trying to avoid police contact or identification.

Officer Dykstra ran the vehicle tag and learned that the vehicle belonged to Holly Denton, who he knew was the owner of the vehicle and James Wheeler's mother. The officers then decided to set up surveillance on the vehicle. When the vehicle left the convenience store parking lot, with Reynolds driving, the officers followed. Reynolds soon pulled into a private drive, and the officers proceeded down the street, turned around, and continued to watch the vehicle. The officers noticed some movement toward the rear of the vehicle but couldn't see clearly due to poor lighting conditions in the area. The officers resumed their tail of the vehicle when they saw it back out of the private drive and proceed in the opposite direction of the patrol car.

The vehicle came to a stop at the intersection of Kessler and West University streets. As it pulled forward, the driver began making a right hand turn but did not begin using the turn signal until the turn was being executed. The officers then initiated a traffic stop for failing to signal 100 feet before making the turn in violation of Wichita City Ordinance § 11.28.040(b).

Officer Balthazor approached the vehicle on the passenger side, and Officer Dykstra approached the vehicle on the driver side. Officer Balthazor reached the vehicle first. Upon reaching the vehicle, the officers noted that a young female was now driving it and that Reynolds was sitting in the right rear passenger seat. Specifically, Officer Balthazor observed that Reynolds was slouched down in the seat and avoiding eye contact with him. Officer Balthazor then asked the driver for her license and insurance. The female passenger in the front passenger seat stated that the driver was her daughter and that she only had a learner's permit. Officer Balthazor then told the driver to speak with Officer Dykstra, who at that point, was standing on the driver's side of the vehicle.

While Officer Dykstra was speaking with the driver, Officer Balthazor asked Reynolds if he had a driver's license. Reynolds indicated that he did not. Officer Balthazor then asked him to step out of the vehicle, and Reynolds leaned forward, pushing his body forward, and put his hands on the floorboard near his right leg. Concerned that Reynolds might be reaching for a weapon or trying to hide evidence, Officer Balthazor drew his weapon and ordered him to show his hands. Reynolds did not immediately comply, and instead, continued to lean forward and say something to the front passenger. Officer Balthazor ordered Reynolds out of the car, and within ten seconds, Reynolds stepped out of the vehicle. Officer Balthazor handcuffed Reynolds and patted him down. The search did not reveal a weapon or other contraband. Officer Balthazor then placed Reynolds in the passenger seat of the patrol vehicle.

After placing Reynolds in the patrol car, Officer Balthazor asked Reynolds for his name, telling him to spell it. Reynolds identified himself as "Charles Welliever." He also stated that he was living with a friend, James Wheeler. The WPD had no information concerning a "Charles Welliever," so Officer Balthazor asked Reynolds once again for his name. Reynolds gave the

same first and last names, but this time he changed the spelling of his last name to "Welliver." Reynolds then told the officer that he had information about James Wheeler being involved in two homicides. Officer Balthazor read Reynolds his *Miranda* rights and contacted another WPD officer, Sergeant Seiler, regarding the potential information. After speaking with Sergeant Seiler, Officer Balthazor spoke with Reynolds again, explaining that Reynolds needed to give the officers his true name before he could speak with them about any information concerning Wheeler. At that point, Reynolds positively identified himself as "Christopher Reynolds."

During Officer Balthazor's interaction with Reynolds, Officer Dykstra and another WPD officer who arrived on the scene removed the driver and the other female passenger from the vehicle. Officer Dykstra then looked into the rear passenger seat area of the car with his flashlight. In plain sight, he saw a clear plastic bag with a white substance in it. He then entered the vehicle and found another clear plastic bag with a white crystal substance, which he believed to be methamphetamine. Officer Dykstra also noticed that the rear driver's side seat was pulled down, which provided access to the trunk. Looking in the trunk from the back seat area, Officer Dykstra saw what appeared to be the broken-off butt stock of a shotgun. He opened and searched the trunk, finding a sawed-off shotgun and a Remington 12 gauge shotgun.

Officer Dykstra informed Officer Balthazor about what he found in the vehicle. Reynolds was still detained in Officer Balthazor's patrol car at the time, so Officer Balthazor questioned him about the guns. Reynolds denied ownership of the guns and initially denied knowing that they were in the trunk. He later recanted and said that he had helped James Wheeler move them from Wheeler's residence to the trunk. Reynolds was arrested based on the items in the vehicle and taken to the WPD to speak with homicide detectives.

The grand jury returned an indictment charging Reynolds with one count of possession of an unregistered firearm. Reynolds subsequently filed two motions to suppress, and the Court held a hearing on the motions. At the hearing, Reynolds testified that James Wheeler gave him permission to use the car about twenty minutes before the officers first observed him at the convenience store. He also testified that although the car was not always located at Wheeler's residence, it appeared to be Wheeler's car to freely use.

## II. Analysis

Reynolds moves to suppress the Government's evidence, arguing that the initial stop of the vehicle, his subsequent detention in Officer Balthazor's patrol car, and the search of the vehicle violated his Fourth Amendment rights. In response, the Government argues that the officers had sufficient reasonable suspicion of criminal activity to stop the vehicle and perform an investigatory detainment. The Government also challenges whether Reynolds had a reasonable expectation of privacy in the car because he did not own it and was a passenger at the time of the stop. Because the Government essentially asserts that Reynolds lacks standing to challenge the evidence seized from the car, the Court will first address the issue of Reynolds' reasonable expectation of privacy.[1] Then it will address Reynolds' detention and the search of the vehicle.

---

[1] The Court recognizes that even if Reynolds does not have standing as a passenger to challenge the search of the vehicle, he does have standing to challenge the initial stop, the investigatory detention, and any evidence discovered in the vehicle as the fruit of an unlawful stop. *See United States v. Shareef*, 100 F.3d 1491, 1500 (10th Cir. 1996) ("We 'distinguish passenger standing to directly challenge a vehicle search from passenger standing to seek suppression of evidence discovered in a vehicle as the fruit of an unlawful stop, detention, or arrest.' ") (quoting *United States v. Eylicio-Montoya*, 70 F.3d 1158, 1162 (10th Cir. 1995)).

**A.      Reasonable Expectation of Privacy**

The Fourth Amendment protects citizens from "unreasonable searches and seizures" conducted by state or federal government officials.[2]  As the party seeking suppression, Reynolds must demonstrate that his Fourth Amendment rights were violated.[3]  This principle is often called "standing," but the idea that personal Fourth Amendment rights must be at stake "is more properly subsumed under substantive Fourth Amendment doctrine."[4]  The party seeking suppression has the burden of citing facts at the suppression hearing indicating that his own rights were violated by the search.[5]  The determination of whether a defendant's rights were violated turns on whether:  (1) the defendant can show a subjective expectation of privacy in the area searched, and (2) society is prepared to recognize that expectation as objectively reasonable.[6]  A defendant has a reasonable expectation of privacy in a vehicle when he shows "a legitimate possessory interest in or lawful control over the car."[7]

This case presents the unique issue of whether a non-owner passenger of a car, who was driving the car shortly before it was stopped, has a reasonable expectation of privacy in that car. In *Rakas v. Illinois*,[8] the Supreme Court found that the defendants who were passengers in a car driven by the owner at the time of the search did not have a legitimate expectation of privacy in

---

[2] U.S. Const. amend. IV; *Mapp v. Ohio*, 367 U.S. 643, 655 (1961); *United States v. White*, 584 F.3d 935, 944 (10th Cir. 2009).

[3] *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978).

[4] *Id*. at 139.

[5] *United States v. Eckhart*, 569 F.3d 1263, 1274 (10th Cir. 2009) (citation omitted).

[6] *Id*.

[7] *United States v. Allen*, 235 F.3d 482, 489 (quoting *United States v. Gama-Bastidas*, 142 F.3d 1233, 1239 (10th Cir. 1998)) (internal quotation marks omitted).

[8] 439 U.S. 128 (1978).

the car such that they could raise a Fourth Amendment challenge to the search of the vehicle.[9] The Court held that a "passenger *qua* passenger" has no reasonable expectation of privacy in a car in which he asserts neither a property interest nor a possessory interest and where he disclaims any interest in the object seized.[10]

The Tenth Circuit generally has applied *Rakas* to conclude that passengers lack standing to challenge vehicle searches.[11] In *United States v. Eylicio-Montoya*,[12] the Tenth Circuit briefly addressed whether a passenger who previously drove a car had standing to challenge its search. The defendant in that case borrowed the car from her son, who had borrowed it from his father, and took it to get it serviced.[13] An unknown period of time later, United States Customs Agents observed the vehicle leave a motel one morning and followed it.[14] The agents subsequently stopped the car and searched it. At the time of the stop, the defendant was a passenger in the car.[15] The Tenth Circuit held that the defendant-passenger lacked standing to challenge the search of the vehicle because the only testimony she offered with regard to her interest in the car was that her son allowed her to drive it before the stop.[16] According to the Tenth Circuit, "[s]uch

---

[9] *Id*. at 148-49.

[10] *Id*.

[11] *See, e.g., United States v. Lewis*, 24 F.3d 79, 81 (10th Cir. 1994), *cert. denied*, 513 U.S. 905 (1994); *United States v. Jefferson*, 925 F.2d 1242, 1249 (10th Cir. 1991), *cert denied*, 502 U.S. 884 (1991).

[12] 70 F.3d 1158 (1995).

[13] *Id*. at 1161.

[14] *Id*. at 1160.

[15] *Id*.

[16] *Id*. at 1162.

prior control of a vehicle is insufficient to establish a passenger's standing to directly challenge a search."[17]

Although it is a close call, the Court does not find the same here. Reynolds testified at the hearing that Wheeler gave him permission to drive the car approximately twenty minutes before the officers first saw him driving it on the night of November 10. He also testified that he gave the young lady who was driving the car at the time of the stop permission to drive it and that she had only driven it thirty seconds before the officers stopped it.[18] This differs from the defendant in *Eylicio-Montoya*, who only offered evidence that she previously drove the car to get it serviced. Furthermore, the Tenth Circuit does not state the amount of time from when the defendant in *Eylicio-Montoya* drove the car and the time the U.S. Customs Agents stopped it, but it certainly was not less than a minute or even the same day as the stop. Reynolds has shown a sufficient possessory interest in the vehicle such that he has a protectable Fourth Amendment privacy right in it. Therefore, the Court finds that Reynolds has standing to challenge the search of the vehicle.[19]

---

[17] *Id.*

[18] To the extent the Government asserts that Reynolds did not have a possessory interest in the car because he borrowed it from James Wheeler, who in turn borrowed the car from his mother—Holly Denton—the Court rejects this argument. The Tenth Circuit has held that a defendant who drives a borrowed car may establish standing by establishing that he obtained possession from the owner or someone with authority to grant possession. *Eckhart*, 569 F.3d at 1274. Reynolds testified at the hearing that Wheeler often drove the car and gave him permission to use it the night of November 10. Thus, although the evidence is not overwhelming, because Reynolds has established that Wheeler was a customary user of the car and gave Reynolds permission to drive it, the Court finds that Reynolds had a reasonable expectation of privacy in it.

[19] *See United States v. Rose*, 731 F.2d 1337, 1343 (8th Cir. 1984) (finding that a passenger who had received his sister's permission to use the car, drove the car as much as two to three times per week, had keys to both the ignition and trunk, and had given the driver permission to drive the car, had standing to challenge the search of the vehicle).

**B.     Reasonable Suspicion for the Initial Stop and Investigatory Detention**

In interpreting the Fourth Amendment, courts have recognized three types of encounters between police and a citizen.[20] These are consensual encounters, investigatory detentions, and custodial arrests.[21] "These categories are not static and may escalate from one to another."[22] For example, a consensual encounter may escalate into an investigative detention. Or, an investigative detention may escalate into an arrest or de-escalate into a consensual encounter. A court must analyze each stage of the encounter to determine whether the required level of suspicion or cause is present at each stage.[23]

Reynolds' motions primarily implicate the second category of police-citizen encounters—investigatory detention. Reynolds argues that the officers did not have reasonable suspicion to stop the car. He also argues that they exceeded the scope of the stop when they ordered him out of the car and placed him the patrol car for approximately twenty-five minutes before reading his *Miranda* rights. The Court will address each of Reynolds' arguments below.

*A.     The Initial Stop*

Although they are often brief, a traffic stop is a seizure under the Fourth Amendment, and thus, is only constitutional if it is reasonable.[24] The law is well settled that a traffic stop is

---

[20] *United States v. Brown*, 496 F.3d 1070, 1074 (10th Cir. 2007) (citing *United States v. Davis*, 94 F.3d 1465, 1467-68 (10th Cir. 1996)).

[21] *Id*.

[22] *Cortez v. McCauley*, 478 F.3d 1108, 1115 n.5 (10th Cir. 2007) (citing *Shareef*, 100 F.3d at 1500).

[23] *Shareef*, 100 F.3d at 1500.

[24] *United States v. Callarman*, 273 F.3d 1284, 1286 (10th Cir. 2001) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)).

justified when police have probable cause to believe that a traffic violation has occurred.[25] The Court's only inquiry is whether the officers had reasonable suspicion that the driver violated any applicable traffic or equipment regulations.[26] As long as the officers can articulate specific facts that give rise to such a violation, the stop is justified.[27]

Both K.S.A. § 8-1548 and Wichita City Ordinance § 11.28.040(b) require a driver to signal at least 100 feet before making a right or left turn. In this case, both officers testified that the driver failed to signal 100 feet before turning right. The officers had reasonable, articulable suspicion to believe that the driver violated the Kansas statute and city ordinance. Therefore, the traffic stop was justified and lawful.

      *B.*      *Length and Scope of Stop*

Reynolds argues that Officer Balthazor exceeded both the duration and scope of the stop when he ordered him out of the vehicle and detained him in his patrol car for approximately twenty-five minutes. "An officer may not extend a traffic stop beyond a reasonable duration necessary to accomplish the purpose of the stop unless the driver consents to further questioning or the officer has reasonable suspicion to believe other criminal activity is afoot."[28] However, while such a stop is ongoing, "an officer has wide discretion to take reasonable precautions to protect his safety."[29] With respect to passengers of a vehicle, the Supreme Court has found that

---

[25] *Whren v. United States*, 517 U.S. 806, 810 (1996).

[26] *Eckhart*, 569 F.3d at 1271 (citing *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995)).

[27] *Id*.

[28] *United States v. Rice*, 483 F.3d 1079, 1084 (10th Cir. 2007) (citing *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1259 (10th Cir. 2006)).

[29] *Id*. at 1079.

passengers present a risk to officer safety equal to the risk presented by the driver.[30] The Court has thus held that "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop."[31] This rule applies regardless of whether there is any evidence of potential risk to the officer conducting the stop.[32] Furthermore, the Tenth Circuit has extended this holding to allow officers to ask for identification from passengers and run background checks on them.[33]

In this case, Officer Balthazor asked Reynolds if he had identification, and when Reynolds responded that he didn't, he ordered him out of the vehicle. This questioning occurred before Officer Dykstra was finished speaking with the female driver and other female passenger in the car, and thus did not extend the duration of the stop. Based on the case law above, Officer Balthazor's actions were fully justified by officer safety concerns and did not need to be supported by reasonable suspicion. Therefore, Officer Balthazor did not exceed the scope or duration of the stop by ordering Reynolds out of the vehicle.

After Officer Balthazor ordered Reynolds out of the car, Reynolds made furtive movements toward his feet, which was consistent with a person either going for a weapon or trying to dispose of evidence. As a result, when Reynolds exited the vehicle, Officer Balthazor handcuffed him and patted him down. Officer Balthazor then placed him in the patrol car for approximately twenty-five minutes before reading him his *Miranda* rights. Reynolds does not challenge Officer Balthazor's actions of handcuffing him or patting him down. Furthermore, the

---

[30] *Maryland v. Wilson*, 519 U.S. 408, 413-14 (1997).

[31] *Id*. at 413.

[32] *See id*. at 416 (Stevens, dissenting) (stating that the Court's ruling "applies equally to traffic stops in which there is not even a scintilla of evidence of any potential risk to the police officer.").

[33] *Rice*, 483 F.3d at 1084 (citations omitted).

issue of whether Reynolds should have remained in handcuffs after being patted down does not give rise to a suppressible issue.  Therefore, the Court will not address the propriety of these actions in this Order.  Instead, the Court will turn to whether Officer Balthazor exceeded the scope and duration of the stop by detaining Reynolds in the patrol car.

Based on the circumstances of this case, the Court finds he did not.  Officer Balthazor testified at the hearing that he continued to detain Reynolds because he was trying to positively identify him.  As noted above, the Tenth Circuit has held that an officer may detain a passenger to identify him and run a background check.[34]  Officer Balthazor further testified that once he put Reynolds in the vehicle, Reynolds did not give him his real name.  Instead he gave him an alias, and when that alias did not return any records from the WPD, Reynolds changed the spelling of that alias, requiring Officer Balthazor to run the same false name through WPD records.  "When a defendant's own conduct contributes to a delay, he or she may not complain that the resulting delay is unreasonable."[35]  Reynolds' false identification certainly increased the length of the stop.  Thus, the Court concludes that under these circumstances, Officer Balthazor did not extend the traffic stop beyond the reasonable duration necessary to accomplish its purpose.

### C.     Seizure of Evidence from the Vehicle

Reynolds challenges Officer Dykstra's seizure of evidence from the vehicle, arguing that Officer Dykstra did not have probable cause to search it.  In response, the Government argues that Officer Dykstra's search was permissible under both the automobile exception and plain view doctrine.  The Court finds both exceptions are implicated under the facts of this case.

---

[34] *Id.*

[35] *Shareef*, 100 F.3d at 1501 (citing *United States v. Sharpe*, 470 U.S. 675, 699-700 (1985)).

The Fourth Amendment generally requires police to obtain a warrant before conducting a search.[36] Police officers, however, may search a vehicle if the circumstances are such that the "automobile exception" applies.[37] Under this exception, "police officers who have probable cause to believe there is contraband inside an automobile that has been stopped on the road may search it without obtaining a warrant."[38] "Probable cause to search an automobile exists 'where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found.' "[39]

The "plain view doctrine" allows an officer to seize evidence of a crime without obtaining a warrant if "(1) the officer was lawfully in a position from which the object seized was in plain view; (2) the object's incriminating character was immediately apparent . . .; and (3) the officer had a lawful right of access to the object."[40] Both the plain view doctrine and automobile exception have been used in combination to uphold warrantless vehicle searches.[41] For example, "if an officer has lawfully observed an object of incriminating character in plain view in a vehicle, that observation, either alone or in combination with additional facts, has been held sufficient to allow the officer to conduct a probable cause search of the vehicle."[42]

---

[36] *California v. Carney*, 471 U.S. 386, 390 (1985).

[37] *Florida v. Meyers*, 466 U.S. 380, 381 (1984) (per curiam); *United States v. Vasquez*, 555 F.3d 923, 930 (10th Cir. 2009) (citation omitted).

[38] *Vasquez*, 555 F.3d at 930 (citing *Meyers*, 466 U.S. at 381).

[39] *United States v. Montes-Ramos*, 347 F. App'x 383, 395-96 (10th Cir. 2009) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1966)).

[40] *Id.* at 390 (quoting *United States v. Angelos*, 433 F.3d 738, 748 (10th Cir. 2006)) (internal quotation marks omitted).

[41] *United States v. Sparks*, 291 F.3d 683, 690 (10th Cir. 2002).

[42] *Id.*

The first question the Court must address is whether the clear plastic baggie containing white powder came lawfully within Officer Dykstra's plain view. Officer Dykstra testified that the rear passenger door of the vehicle was already open when he looked into the car. Thus, anyone walking by the car could have looked in and viewed the bag on the rear seat. Officer Dykstra also testified that he recognized the substance as possibly being methamphetamine and that he was able to lean into the car to retrieve it. This testimony is enough for the Court to conclude that all three requirements of the plain view doctrine have been met. Thus, Officer Dykstra had probable cause to seize the bag from the vehicle.

The next question is whether the plastic bag with the white substance gave Officer Dykstra probable cause to search the rest of the vehicle. Because Officer Dykstra recognized the white substance as possibly being methamphetamine, it is reasonable conclude that such bag was of "incriminating character." Combined with the fact that the occupants of the vehicle attempted to evade the officers before the stop and that the occupants were unable to provide a valid driver's license or other form of identification when they were stopped, the Court finds that Officer Dykstra had probable cause to believe that the vehicle might contain additional evidence of criminal wrongdoing. Officer Dykstra's search of the vehicle, including the trunk, and his seizure of evidence from the vehicle therefore did not violate Reynolds' Fourth Amendment rights.

### III.   Conclusion

Reynolds had a reasonable expectation of privacy in the Nissan he was driving the night of November 10 even though he was a passenger in the vehicle at the time it was stopped. The officers reasonably believed the driver of the vehicle committed a traffic violation, and therefore, the traffic stop was lawful. Officer Balthazor did not unreasonably extend the scope or duration

of the stop by ordering Reynolds out of the vehicle or detaining him in his patrol car for approximately twenty-five minutes before reading him his Miranda rights.  Furthermore, Officer Dykstra's seizure of evidence from the vehicle was lawful under the plain view and automobile exceptions to the Fourth Amendment's warrant requirement.  Based on these findings, the Court will not suppress the evidence from the Nissan or Reynolds' statements to Officer Balthazor.  Reynolds' motions to suppress are denied.

**IT IS THEREFORE ORDERED** that Defendant Christopher Reynolds' Motion to Suppress Statements (Doc. 26) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Christopher Reynolds' Motion to Suppress (Doc. 27) is **DENIED**.

**IT IS SO ORDERED**.

Dated this 11th day of October, 2016.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE